Filed 10/28/15  Save Desert Rose v. City of Encinitas CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAVE DESERT ROSE, | D066218 |
| Plaintiff and Respondent, | (Super. Ct. No. 37-2013-00044139-CU-JR-NC) |
| v. | |
| CITY OF ENCINITAS, | |
| Defendant; | |
| WOODRIDGE FARMS ESTATES, LLC, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Reversed.

Coast Law Group, Marco A. Gonzalez and Chris C. Polychron for Appellant and Real Party in Interest.

DeLano & DeLano, Everett L. DeLano III and M. Dare DeLano for Plaintiff and Respondent.

Woodridge Farms Estates, LLC (Woodridge) appeals from the trial court's judgment and writ of mandate in favor of Save Desert Rose (SDR), ruling that the City of Encinitas (the City) should have required the preparation of an environmental impact report (EIR) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] for a residential development proposed by Woodridge rather than adopting a mitigated negative declaration. We conclude that based on the project description in the mitigated negative declaration, there is no substantial evidence in the administrative record to support a fair argument that Woodridge's proposed project may have a significant effect on the environment within the meaning of CEQA. Accordingly we reverse the judgment and direct the trial court to enter an order denying the petition for writ of mandate.

I.

FACTUAL AND PROCEDURAL BACKGROUND

In 2009, Woodridge filed an application seeking approval from the City's planning commission of a tentative map and the issuance of a design review permit for a real estate development on a 7.87-acre lot in the City, located in the community of Olivenhain (the Project).[2] The Project would subdivide a 7.87-acre lot currently used as a commercial

[1]    Unless otherwise indicated, all further statutory references are to the Public Resources Code.

[2]    Approval for the construction plans for the proposed homes was not sought in the application at issue here and will presumably be sought in later applications to the City.

2

equestrian facility into 16 single-family residential lots, with one private street cul-de-sac.[3]

The Project includes the removal of the equestrian facilities (stables, riding rings and associated outbuildings), grading of the site, creation of street improvements, dedication of a public recreational trail for equestrian use, installation of drainage and stormwater treatment facilities, and the planting of landscaping. As relevant here, as part of the grading and landscaping activity, the Project would remove up to 34 trees within the Project site, primarily consisting of eucalyptus and pine species,[4] and those trees would be replaced by 48 tree species that are fire resistant and noninvasive.

The Project parcel is zoned for residential development and is bordered by a residential neighborhood on the south and west. Located along the northern and eastern boundaries of the parcel is a .56-acre wetland and riparian habitat, consisting of a natural

---

[3] Although not directly relevant to our resolution of this appeal, we note that in proposing to divide the Project site into 16 residential lots, Woodridge sought to take advantage of the density bonus law set forth in Government Code, section 65915, which allows for development of more dense subdivisions than would otherwise be permitted by local development standards when the developer commits to build a certain amount of affordable housing units as part of the subdivision. Based on the density bonus law, the Project would be built with a density that adds four units above the number of units that would otherwise have been allowed by the City's general plan.

[4] We note that the record is unclear about how many mature trees currently exist on the Project site, and how many will have to be removed in connection with the grading work. Although City staff comments identified 34 existing trees to be removed, the Landscape Concept Plan in the record, dated October 10, 2012, states that there are 31 existing mature trees on the site, including 17 eucalyptus trees. The Landscape Concept Plan also indicates the location of the current trees, several of which may be outside of the area proposed to be graded, and states that "existing mature trees must be preserved to the greatest extent feasible within the easements for" the adjacent streets.

3

drainage channel that is an unnamed tributary of Escondido Creek. There is currently no buffer between the equestrian facility and the wetland. Consequently, the wetland is a poorly developed riparian habitat, with the presence of numerous nonnative plant species and lack of vegetation in some areas, and it supports a low diversity and number of animal species, none of which are sensitive species.

According to the City's General Plan and Municipal Code, a 50-foot-wide buffer generally should be used for proposed development adjacent to riparian wetland areas, but in some cases smaller buffers may be appropriate.[5] Here, the Project proposal includes a 25-foot buffer and other measures to protect the wetland habitat. Included in these additional measures are two items recommended by the United States Fish and Wildlife Service and the California Department of Fish and Game[6] as a condition to their approval of the use of a 25-foot buffer for the Project: (1) a fence at least six feet high

---

[5]    The City's general plan states that "50 foot wide buffers should be provided adjacent to riparian areas. In some cases, smaller buffers may be appropriate, when conditions of the site as demonstrated in a site specific biological survey, the nature of the proposed development, etc., show that a smaller buffer would provide adequate protection; and when the Department of Fish and Game has been consulted and their comments have been accorded great weight." The City's municipal code states that "riparian wetland areas . . . shall require a minimum 50 foot wide buffer, unless the applicant demonstrates that a buffer of lesser width will protect the resources of the wetland, based on site-specific information. Such information shall include, but is not limited to, the type and size of the development and/or proposed mitigations (such as planting of vegetation or construction of fencing) which will also achieve the purposes of the buffer. . . . The California Department of Fish and Game and the U.S. Fish and Wildlife Service . . . shall be consulted in such buffer determinations." (Encinitas Mun. Code, § 30.34.040B3b.)

[6]    As of January 1, 2013, the California Department of Fish and Game is known as the California Department of Fish and Wildlife. (Fish & G. Code, § 37.)

4

constructed between the Project and the wetland; and (2) the implementation of a wetland enhancement plan.

After receiving Woodbridge's application, the City staff prepared an initial study pursuant to CEQA, summarizing and evaluating the various technical studies that were prepared for the Project by outside consultants.[7] The initial study concluded that the Project could have a significant environmental effect on biological resources, specifically, as relevant here, (1) possible impacts to any sensitive raptor nests, including Cooper's Hawks, that may be present in the eucalyptus trees to be removed from the Project site; and (2) indirect impacts to sensitive wetland habitat due to the location of future development adjacent to the natural drainage channel.[8] The initial study

---

[7]  As explained in the CEQA Guidelines, "(a) [f]ollowing preliminary review, the lead agency shall conduct an initial study to determine if the project may have a significant effect on the environment."  (Cal. Code Regs., tit. 14, § 15063.)  As part of the initial study, the City completed an initial study checklist pursuant to appendix G of the CEQA Guidelines which "contains an ' " 'Environmental Checklist Form' . . . designed to be used as an initial study to determine if a project may have a significant effect on the environment." '  . . .  ' "The checklist consists of sample questions divided into categories of potential physical impacts a project may have." ' "  (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 732, citations omitted.)

[8]  The initial study also noted that .06 acre of disturbed coastal sage scrub habitat and .06 acre of nonnative grassland habitat would be disturbed due to the fuel modification plan required for fire safety, but that the environmental impact of that habitat disturbance would be reduced to below a level of significance because, as a condition of approval of the Project, Woodridge was to acquire and conserve equivalent offsite habitat, which could be accomplished through purchasing credits from a mitigation bank.

5

recommended that these possible impacts be mitigated through measures that would be set forth in a mitigated negative declaration (MND) as provided by CEQA.[9]

The MND proposed by City staff contained the following relevant items: (1) if trees are removed from the Project site during Cooper's Hawk nesting season, a qualified biologist shall conduct a survey three days prior to determine whether there are any active nests, and if so, a buffer shall be set up and no removal of those trees shall occur until the nesting cycle is complete; (2) a minimum 25-foot-wide biological open-space easement shall be recorded as shown on the tentative map between the development and the wetland habitat, which shall include a 25-foot buffer protected by permanent fencing, with no gates, to prevent intrusion by cats and other pets;[10] (3) during construction of the Project the biological easement shall be protected with construction and silt fencing that shall be portrayed on the construction plans to the satisfaction of the City's planning and building department director; (4) a wetland enhancement plan shall be approved by the City's planning and building department, and shall be implemented prior to occupancy of

---

[9]     As set forth in the CEQA Guidelines, "[a] public agency shall prepare or have prepared a proposed . . . mitigated negative declaration for a project subject to CEQA when: [¶] . . . [¶] (b) The initial study identifies potentially significant effects, but: (1) Revisions in the project plans or proposals made by or agreed to by the applicant before a proposed mitigated negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and (2) There is no substantial evidence, in light of the whole record before the agency, that the project as revised may have a significant effect on the environment." (Cal. Code Regs., tit. 14, § 15070.)

[10]     The open-space component of the Project, which includes wetland and wetland buffer areas, would total approximately 1.72 acres of the total 7.87-acre property.

6

the residences proposed for Project;[11] (5) construction plans shall contain certain additional measures to protect the environment during construction, as listed; and (6) Project landscape plans shall be approved by the City prior to the issuance of a building permit and shall not contain exotic plant species that may be invasive or require excessive irrigation, and potential runoff shall be contained or treated within the development footprint.

The planning commission held a public hearing on November 1, 2012, and thereafter issued a resolution denying Woodridge's application, with a three-to-two vote. In denying the application, the planning commission declined to adopt the MND and found that "the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially or avoidably injure fish or wildlife or their habitat."

Woodridge appealed the planning commission's decision to the City Council, and the City Council conducted public hearings on January 23 and March 13, 2013, with the City's staff preparing answers to several questions posed by the City Council following the January 23 hearing. In a resolution adopted April 17, 2013, the City approved

---

11     The wetland enhancement plan provides that approximately one-half acre of exotic plants will be removed from the wetland habitat on the Project parcel and in a smaller area upstream from the parcel. Also included in the wetland enhancement plan is the nonwetland habitat of southern maritime chaparral, dominated by environmentally sensitive Nuttall's Scrub Oak vegetation, which is adjacent to the wetland area. The area covered by the enhancement plan will be monitored for five years to assess natural revegetation, and the area will be replanted with native plants if revegetation does not occur naturally.

Woodridge's application for the Project and formally adopted the MND. The City Council found that "with incorporation of the mitigation measures contained in the MND . . . , the proposed subdivision is not likely to cause substantial environmental damage or substantially or avoidably injure fish or wildlife or their habitat."

In addition to adopting the MND, the City Council approved Woodridge's application with certain other conditions that are relevant here. Specifically, the City required that Woodridge provide the public equestrian trail proposed for the Project, and it required that Woodridge comply with certain engineering and geotechnical conditions, including compliance with stormwater management regulations and drainage requirements. Before any grading takes place for the Project, Woodridge is required to apply for and obtain a grading permit and meet several other requirements, including obtaining approval from the City of a plan to implement stormwater best management practice controls, and submit a geotechnical report.

SDR filed a petition for writ of mandate in the trial court to challenge the City's adoption of the MNR, and Woodridge and the City both opposed SDR's petition. The trial court ruled in favor of SDR and issued a writ of mandate, setting aside the City's approval of Woodridge's application and adoption of the MND, and enjoining Woodridge from taking any step to further the Project that could result in an adverse change to the environment pending lawful approval from the City. The trial court's statement of decision concluded that "the record establishes substantial evidence existed to make a fair argument that the project may cause a significant adverse effect on the environment such that the City Council should have prepared an [EIR] instead of issuing [an MND]."

8

Woodbridge appeals from the trial court's judgment.

II.

DISCUSSION

A. *Applicable Legal Standards*

Under CEQA, "[a]n EIR provides detailed information about the likely effect a proposed project may have on the environment, lists ways in which significant effects might be minimized and indicates alternatives to the project. (. . . § 21061.) An EIR is required whenever there is a ' "fair argument" ' that significant impacts may occur. [Citation.] [¶] When there is no substantial evidence before the lead agency that the project may have a significant effect on the environment, a negative declaration instead of an EIR, is appropriate. (. . . § 21080, subd. (c)(1).) When the initial study identifies potentially significant effects on the environment, but revisions in the project plans would avoid or mitigate the effects to insignificance, a MND is appropriate. (. . . § 21064.5.)" (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 399.) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.)[12]

---

[12]     As provided in the CEQA Guidelines, " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Cal. Code Regs., tit. 14, § 15382.) "The CEQA Guidelines . . . are regulations adopted by the secretary of the Natural Resources Agency to implement CEQA. . . . 'In interpreting CEQA, we

"Application of the fair argument standard of review presents a question of law, not fact, and we do not defer to the agency's or the trial court's determinations on this issue. [Citation.] 'Rather, we independently "review the record and determine whether there is substantial evidence in support of a fair argument [the proposed project] may have a significant environmental impact, while giving [the lead agency] the benefit of a doubt on any legitimate, disputed issues of credibility." ' " (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 900.)

The party challenging an agency's decision not to prepare an EIR "has the burden of proof 'to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact.' [Citation.] 'Unless the administrative record contains this evidence, and [petitioners] cite[] to it, no "fair argument" that an EIR is necessary can be made.' " (*Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768, 778.) In this context, as set forth in the CEQA Guidelines, " '[s]ubstantial evidence' . . . means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . . Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not

_____

accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' " (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 226, fn. 3, citations omitted.)

10

contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence," and "[s]ubstantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Cal. Code Regs., tit. 14, § 15384, subds. (a), (b).)[13]

If the petitioner demonstrates substantial evidence to support a fair argument of a significant effect on the environment "the reviewing court must set aside the agency's decision to adopt a negative declaration or a mitigated negative declaration as an abuse of discretion in failing to proceed in a manner as required by law." (*Citizens for Responsible and Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1332.)

B.      *Alleged Unmitigated Environmental Impacts Identified by SDR*

As it did in the trial court, SDR identifies several different categories of alleged significant environmental impacts from the Project, which it contends required that the City prepare an EIR rather than adopt the MND. Specifically, SDR identifies alleged impacts on (1) biological resources; (2) aesthetics, views and community character; (3) water quality and drainage; (4) traffic; (5) neighborhood streets and safety; and (6) parking. We consider each of these categories in turn.

---

[13]     Similarly, as stated in section 21080, subdivision (e): "(1) [S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact. [¶] (2) Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment."

11

1.      *Biological Resources*

SDR's argument concerning the Project's impact on biological resources focuses on the two categories that the City's initial study also identified as potential significant environmental impacts prior to the adoption of the MND, namely, the possible harm to nesting raptors in the eucalyptus trees on the Project site and (2) the impact to the wetland habitat from the residential development proposed by the Project.

a.      *Impact on Raptors of Tree Removal*

Concerning the removal of the trees that are currently on the Project site, SDR contends that the administrative record supports a fair argument that the removal of those trees will have a significant negative effect on sensitive raptor species.  In support of its argument, SDR points to the 2009 biological report prepared for the initial study, which states that the Project site contains "[n]umerous [e]ucalyptus trees that could potentially serve as nesting sites for Cooper's Hawks," a sensitive bird species.  SDR also points to two neighborhood residents' general comments about "the value of the on-site trees for habitat."[14]

We reject SDR's contention that the record raises a fair argument of significant impact from the Project on Cooper's Hawks or other sensitive raptors.  Initially, we note

---

14      One neighborhood resident wrote that "[t]he cutting down of the numerous trees on the property will have a negative impact.  They should be replaced on [a] one to one basis with native trees with the goal to diminish the visual impact of the project *and replace nesting sites*."  (Italics added.)  Another neighborhood resident recalled that when he was building a house on his property he was instructed not to cut down Eucalyptus trees because "these trees provided raptor nesting."

12

that during the biological survey of the site — which consisted of eight visits over the course of one and half years — there was no evidence of Cooper's Hawks, their nests, or any other sensitive raptor species or avian nests.  Second, although it is undisputed that Cooper's Hawks use eucalyptus trees during the nesting season, there is no evidence in the record that eucalyptus tree nesting habitat is in short supply in the area surrounding the Project site such that removal of the trees on the site would significantly impact the ability of Cooper's Hawks to nest in the area.  Instead, the sole concern regarding Cooper's Hawks in the biological assessment report prepared for the Project is that nesting Cooper's Hawks may be impacted if trees are removed during nesting season; there is no concern expressed about loss of eucalyptus tree habitat in the area.  Third, SDR acknowledges that the MND addresses the possible harm to any nesting Cooper's Hawks that may build nests on the Project site prior to construction by providing that, immediately before the eucalyptus trees are scheduled to be removed, a biologist will determine whether Cooper's Hawks are currently nesting in the trees, and if so, tree removal will be delayed until after the nesting cycle is complete.  Accordingly, as any nesting Cooper's Hawks will be undisturbed by the Project and there is no evidence eucalyptus tree habitat is in short supply in the surrounding area, the record does not support a fair argument that the Project will have a significant negative impact on Cooper's Hawks or other sensitive raptors.[15]

---

[15]    In discussing the impact of the Project on biological resources, SDR also mentions the fact that several Torrey Pine trees on the Project site will be removed, but it does not point to any evidence in the record showing that removal of those trees would have a

13

b.      *Impact on Wetland Habitat*

SDR's argument regarding the Project's possible impact on the wetland habitat bordering the Project site on the north and east focuses on evidence in the record pertaining to whether it would have been better for the City to require a 50-foot-wide buffer rather than a 25-foot-wide buffer between the housing development and the wetland habitat. As we will explain, based on the applicable standard for determining whether a significant effect on the environment has been identified, the evidence that SDR relies upon does not raise a fair argument that the Project will significantly impact the wetland habitat.

When conducting an analysis under CEQA to determine whether the record supports a fair argument of a significant impact on the environment, "impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 321.) Under this rule, "the baseline for CEQA analysis must be the 'existing physical conditions in the affected area' . . . that is, the ' " real conditions on the ground." ' " (*Ibid*., citations omitted.) An analysis under CEQA " 'must focus on impacts to the existing environment, not hypothetical situations' " because "[a]n approach using hypothetical allowable conditions

_____

significant effect on the environment. Indeed, the only evidence in the record is to the contrary. Specifically, the biological assessment report states that "there are no major or critical populations of Torrey Pines in the City of Encinitas, only scattered individuals, most of which have been planted," and "[s]ince the ten Torrey Pines on-site are believed to be planted, rather than naturally occurring, the loss of these ten trees is not considered significant. Therefore, no mitigation for their loss is proposed."

14

as the baseline results in 'illusory' comparisons that 'can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts,' a result at direct odds with CEQA's intent." (*Id*. at p. 322.)

Here, as we have explained, the record shows that there is currently *no* buffer between the equestrian facility on the Project site and the wetland habitat. Indeed, some of the equestrian facilities are within a few feet of the wetland habit. Further, the wetland habitat is of poor quality because it contains numerous exotic species and, in some places, lacks vegetation. It is against this baseline condition that we must assess whether the record supports a fair argument that the Project will have a significant negative impact on the wetland habitat.[16]

The record establishes that the measures included in the Project to protect the wetland habitat will improve the habitat over its current condition. The Project will

---

[16]     SDR points out that Woodridge recently performed restoration work in the wetland habit in response to a notice of violation issued to Woodridge under the City's grading ordinance in 2011. Specifically, the notice of violation was issued by the City after a neighborhood resident reported seeing employees of the equestrian facility disturbing the wetland habitat by diverting some of the water flow with a tractor and encroaching on it with rabbit hutches, clotheslines, and a vegetable garden. As a result of the notice of violation, Woodridge agreed to remove all of the encroaching items and to restore the area of the wetland disturbed by the water flow diversion by removing exotic species in the impacted area, monitoring for regrowth of native plants, and planting certain native plants. SDR argues that Woodridge's restoration work in response to the notice of violation has changed the baseline condition of the wetland habitat in a manner that is significant for the CEQA analysis. We disagree. The undisputed evidence in the record shows that the restoration work agreed to by Woodridge in response to the notice of violation was minimal and did not change the essential degraded condition of the wetland habit as a whole. Most significantly, there is still no buffer between the equestrian facility and the wetland habitat, and Woodridge was to remove exotic species only from a limited area disturbed by the tractor activity.

15

create a 25-foot-wide buffer where none currently exists, dedicated as an open-space easement; a six-foot-tall fence will be constructed to further protect the wetland habitat from disturbance; a wetland enhancement plan will be implemented to remove exotic plant species and promote the growth of native wetland vegetation; and the harmful effects of urban runoff into the wetland habitat will be addressed by the City's requirement that the Project comply with up-to-date stormwater management and drainage standards. None of these measures to protect the wetland habitat exists as part of the current baseline condition.

Nevertheless, SDR contends that the record supports a fair argument that the Project will significantly and negatively impact the wetland habitat due to comments in the record concerning the proposal of a 25-foot-wide buffer rather than a 50-foot-wide buffer. However, as we will explain, these comments do not support SDR's argument because they are directed to a different issue, namely whether the City should have required a 50-foot buffer for the Project over a 25-foot buffer, rather than whether the Project will have a significant negative impact on the *baseline* environmental condition of the wetland habitat as it currently exists.

The main evidence upon which SDR relies is a letter from biologist Anita M. Hayworth. Hayworth stated that based on the scientific literature regarding the use of buffers to protect wetland habitats, "much of the sediment and nutrient removal occurs within the first 15 to 30 feet of the buffer but that having a wider buffer, up to 100 feet or more, is able to remove pollutants *more consistently*. A number of studies indicate . . . that no buffers of 25 feet or less were *functioning fully* to reduce disturbance to the

wetlands." (Italics added.) Hayworth explained that "a wetland buffer of 50 feet . . . would provide *improved* protection of the wetlands from human disturbance and other indirect impacts that can occur with a development." (Italics added.) However, Hayworth's comments that it is preferable to use a wider buffer are not evidence of a possible significant impact on the baseline environmental condition of the wetland habitat for at least two reasons.

First, currently no buffer exists between the equestrian facility and the wetland habitat. Thus, even though Hayworth may be correct that a 50-foot-wide buffer would provide more protection of the wetland habitat than a 25-foot-wide buffer, a buffer of any width would still be an improvement to the protection of the wetland habitat. Indeed, Hayworth does not state that a 25-foot buffer will fail to provide *any* protection to the wetland habitat; she simply states that a wider buffer would provide *improved* protection. Second, Hayworth's comments do not take into account the other measures that are incorporated into the Project to protect the wetland habitat, the use of which the state and federal wildlife agencies concluded made a 25-foot buffer an adequate width to protect the wetland habitat. Specifically, Hayworth does not account for the fact that the buffer will provide protection to the wetland habitat *in conjunction with* (1) a six-foot high fence separating the development from the wetland habitat, (2) a wetland restoration plan that will remove exotic species and promote the growth of native riparian plants;[17] and

---

17      Hayworth does acknowledge that the Project includes a wetland enhancement plan, but she discounts its value based on an inaccurate understanding of what it entails. Hayworth refers to the wetland enhancement plan as a passive restoration plan which

17

(3) the installation of up-to-date stormwater management and drainage measures which will direct urban runoff away from the wetland habitat.

SDR also relies on the comments of two local conservation groups regarding the benefits of having a 50-foot-wide buffer. A letter from the San Elijo Lagoon Conservancy states, "The proponent of the reduction claims that the 25 feet will be restored to a higher quality habitat than currently exists on the site. This may be the case, but ecologically a 50[-foot] buffer not restored protects the creek better than the proposed modification."[18] A letter from The Escondido Creek Conservancy states that a 50-foot buffer should be required, asserting without any further support or analysis that a 25-foot-wide buffer "may" negatively affect the environment, and expressing concern for the environmental impact to downstream areas, such as lagoons and beaches.

intends "to rely on 'Mother Nature'," an approach she contrasts with "ecological restoration," which "does address invasive exotic species" and "plac[es] plants in the ground." Here, as we have explained, the Project's wetland enhancement plan includes removal of exotic species, monitoring, and planting of native plants if necessary for revegetation.

[18] The letter from the San Elijo Lagoon Conservancy is also unpersuasive because it relies on a misunderstanding of the facts. Referring to the notice of violation that the City issued to Woodridge, the letter states that "the past practices that impacted the first 25 feet have been stopped through a cease and desist order for Encinitas code enforcement." As we have explained, the record establishes that Woodridge's response to the notice of violation did not serve to significantly remediate the ecological damage to the wetland caused by being located next to the equestrian facility without a buffer. Instead, Woodridge took the limited steps of removing some encroaching items and restoring the native plants in the area impacted by the recent diversion of the water flow with a tractor in the wetland habitat.

The comments from both conservation groups are vague and unsupported by any scientific studies. More importantly, they fail to provide evidence of a significant impact to the environment for the purposes of a CEQA analysis on the same grounds as Hayworth's comments: (1) they state that a 50-foot-wide buffer is *preferable* to a 25-foot-wide buffer, although the current baseline condition is *no* buffer, which provides no protection to either the wetland habitat or the downstream lagoons and beaches; (2) and they fail to account for the other measures that the Project will implement to protect the wetland habitat and that will act in conjunction with the 25-foot buffer to protect the environment.

2.      *Aesthetics, Views and Community Character*

The next category that SDR identifies as being significantly impacted by the Project is "aesthetics, views, and community character."

a.      *Impacts on Aesthetics and Views*

SDR discusses aesthetics and views together, with the argument that mature trees currently on the property will be cut down, impacting the "scenic resources" of the neighborhood. A CEQA analysis properly takes into account the aesthetic impact of a proposed project. "Under CEQA, it is the state's policy inter alia to '[t]ake all action necessary to provide the people of this state with . . . enjoyment of *aesthetic*, natural, scenic, and historic environmental qualities.' (§ 21001, subd. (b); italics added.) The CEQA initial study checklist asks four questions as to aesthetic impact, including whether a project will '[s]ubstantially degrade the existing visual character or quality of the site and its surroundings.' . . . [¶] Thus, courts have recognized that aesthetic issues

19

'are properly studied in an EIR to assess the impacts of a project.' " (*Pocket Protectors v. City Of Sacramento* (2004) 124 Cal.App.4th 903, 936-937, citations omitted.)

With respect to the Project's impact on aesthetics and views, SDR argues that the public's view of the property from the surrounding streets and recreational trails will no longer be of an equestrian facility with mature trees, but will be of newly built houses and newly installed landscaping, impacting the visual quality of the site and its surroundings. In support of its argument, SDR identifies photographs in the record showing that a person walking on a public recreational trail near the property currently has a view of mature trees when looking toward the property.

We reject SDR's argument because the Project, as proposed, will sufficiently mitigate for the removal of trees on the property to address the impact that tree removal will have on the visual character of the site. Although the grading of the site for the Project will require the removal of 34 trees, the landscaping plan for the Project includes the planting of 48 new trees. The view from the neighborhood of the Project site will not be of a barren and unattractive lot as SDR suggests, but rather of a property that contains *more* trees than it formerly did.

b. *Impacts on Community Character*

With respect to the Project's impacts on community character, SDR argues that having a residential development on the site rather than an equestrian facility will significantly change the character of the neighborhood. Specifically, SDR argues that the loss of a horse boarding facility will impact community character, as the record contains evidence that Olivenhain is an equestrian-friendly community, with 21 miles of horse

20

trails in the area and 371 residents owning horses, and thus has "the 'feeling of country.' " As we will explain, SDR fails to identify a significant impact to the environment with respect to community character.

For one thing, the loss of a commercial enterprise, such as the horse boarding facility at issue here, is not an impact on the *environment* for the purposes of CEQA. (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1614 (*South Orange County Wastewater Authority*).)

Moreover, although SDR contends that the Project is inconsistent with the equestrian nature of the community, equestrian uses in the neighborhood will actually be *enhanced* by the Project because the Project will build and dedicate a public equestrian trail through the Project site, where none existed before. Despite SDR's focus on the current equestrian use of the Project site, it is undisputed that the Project site is zoned for residential use and the surrounding neighborhood is residential. Thus, the development of the Project as single-family residences, with a portion of the property dedicated to a public equestrian trail, is fully consistent with the existing character of the neighborhood as a residential area focused on equestrian activities.

3.	*Water Quality and Drainage*

Relying on comments by Richard Horner, an expert in urban stormwater management, who reviewed certain documents concerning the stormwater management and drainage plans for the Project, SDR contends (1) the Project's stormwater management system, as currently planned, may not be adequate to prevent water runoff into the wetland habitat, resulting in a significant impact to the environment; and

21

(2) without an adequate erosion control system in place during construction, the wetland habitat could be damaged by erosion while the Project is being built. We discuss each issue in turn.

a. *Stormwater Management Plan*

As an initial matter, it is important to note that the main documents specific to the Project upon which Horner based his understanding of the Project's stormwater management plan were (1) a Preliminary CEQA Drainage Study by Construction Testing and Engineering, Inc. (CTE, Inc.), dated April 1, 2010; (2) a Water Quality Technical Report by CTE, Inc., dated November 15, 2011; and (3) the tentative map for the Project. Horner stated that the stormwater management plans that he reviewed were too preliminary and not well-developed enough to determine whether they would adequately protect the environment. One thing Horner pointed out was that according to a United States Department of Agriculture (USDA) survey, the soil occurring in the vicinity of the Project includes a type of soil ("hydrologic soil group D"), which may not be infiltrative enough to make bioretention basins a proper choice for stormwater management, but that soil testing of the Project site had not been conducted to determine how much hydrologic soil group D was present.

Horner summarized his analysis of the problems with the stormwater management plans, as reflected in the documents he reviewed, as follows: "The stormwater management plan rests principally on bioretention facilities, which work primarily by infiltrating runoff to the soil, also with some evaporation. The developer proposes this system on a site with soils that have not been characterized by adequate site-specific

22

testing, but that appear to have an extensive hydrologic soil group D component, the least infiltrative soils. The intention, apparently, is to use underdrains in some facilities, surely the ones thought to be in those D soils. However, without careful site investigation, it is little more than a guess if a given location will be in D or the more favorable B soils shown in the USDA survey. A bioretention cell in the D setting without an underdrain is very likely to fail by not retaining its influent runoff but instead discharging it on the surface. The [P]roject should not be considered for approval until the site soils and hydrogeology are thoroughly investigated . . . and the resulting information applied in a thorough reconsideration of the stormwater management plan." Based on this statement, Horner does not say that it is *impossible* to design an adequate stormwater management plan for the Project. Instead, he takes the position that the existing plan should be more closely considered, and perhaps revised, after soils testing is completed to determine the presence of hydrologic soil group D.

Woodridge's engineering firm, CTE, Inc., responded to Horner's letter. It agreed with Horner that when excess hydrologic soil group D is present, it is not proper to rely solely on infiltration-based stormwater best management practices. However, CTE, Inc. pointed out that according to the standards that Woodridge is required to follow by the City, "if during grading it is determined that the post-compaction condition of soils where bio-retention basins will be located do not provide adequate infiltration characteristics, [Woodridge] would be required by the City to apply amendments to achieve necessary soils structure and percolation rates of between 0.5 and 3 inches per hour." Further, CTE,

Inc. explained that "according to the City's [Stormwater M]anual, all bioretention facilities are required to install underdrains to convey water that cannot infiltrate."

As a condition for proceeding with the grading of the site, Woodridge is required to show compliance with the City's Stormwater Manual, which contains specific and detailed regulations for the design and implementation of a stormwater management plan, including those requirements for bioretention basins and soil infiltration characteristics discussed by CTE, Inc. Further, Woodridge must supply the City with a geotechnical report prior to obtaining a grading permit. Therefore, based on CTE, Inc.'s comments in response to Horner, and the requirement that the Project comply with applicable stormwater regulations, we conclude that the issues raised by Horner are not sufficient to raise a fair argument that the Project will have significant effect on the environment due to stormwater runoff. As CTE, Inc. explained, all of the issues raised by Horner are addressed either in the Project documents themselves, or through the City's conditions for approval of the Project, which require that Woodridge comply with detailed stormwater regulations prior to obtaining a grading permit.

To the extent that Horner found that the Water Quality Technical Report by CTE, Inc., dated November 15, 2011, was *not detailed enough* to establish that Woodridge would meet the applicable stormwater quality regulations, CTE, Inc. explained that "[p]rior to the issuance of a grading permit, the City . . . will require a revised [Water Quality Technical Report] detailed for construction purposes." Indeed, the City's specific conditions for approving the Project include the following statement: "The preliminary 'Water Quality Technical Report' dated November 15, 2011 by CTE, Inc. as well as the

24

preliminary grading plan drawings demonstrate that [applicable stormwater management plan] compliance generally can be achieved.  However, this report and the preliminary drawings are not accepted as the final sizing and design of the required [stormwater management] facilities.  This project shall be subject to stormwater quality regulations in effect at the time of issuance of grading permit."  As explained in the City's conditions approving the Project, the requirements which Woodridge must meet for the grading permit to be issued are set forth in detailed applicable regulations, including the Hydromodification Management Plan section of the City's Stormwater Manual, best management practice methods, and additional requirements from the State Water Resources Control Board.  SDR has identified no evidence in the record suggesting that Woodridge will be unable to comply with the applicable regulatory requirements in the more detailed stormwater management plan that it submits as a condition of obtaining a grading permit.

SDR argues that the Water Quality Technical Report submitted for the purpose of CEQA review impermissibly *defers* the specification of a detailed stormwater management plan to a later stage of Project construction.  We disagree.  When considering whether a proposed project adequately mitigates possible environmental impact under CEQA, "[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan."  (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275.)  As relevant here, "a condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be

25

proper where it is reasonable to expect compliance." (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906 (*Oakland Heritage Alliance*).) Following this principle, case law holds that when project documents require a developer to prepare a project water quality plan to reduce discharge into stormwater runoff, including " 'best management practices,' " and the developer must comply with applicable codes, policies and practices to reduce runoff, a project does not impermissibly defer mitigation of possible environmental impact. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 795-796.) Here, where the City "has specified the criteria to be met," by identifying applicable stormwater regulations in its conditions for approval of the Project, and there is no basis in the record for concluding that Woodridge will not be able to comply with the applicable regulations, the level of detail of the Project's stormwater management plan "is sufficient at this early stage of the planning process." (*Defend the Bay*, at p. 1276.)[19]

---

[19]     SDR relies on *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70 and *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260 to argue that Woodridge is required to submit a more detailed stormwater management plan for the purpose of CEQA review, instead of relying on a commitment to comply with applicable stormwater regulations and best management practices. Those cases are not persuasive here, as neither deals with a situation in any way similar to the application of well-defined preexisting stormwater management standards. Specifically, *Communities for a Better Environment* concerned the deferral of the preparation of a plan to mitigate greenhouse gases from a project. The court concluded that it was insufficient to defer the preparation of a plan when a project "merely proposes a generalized goal of no net increase in greenhouse gas emissions and then sets out a handful of cursorily described mitigation measures for future consideration" because "the perfunctory listing of possible mitigation measures . . . are nonexclusive, undefined, untested and of unknown efficacy" with "[t]he only criteria for 'success' of the ultimate mitigation plan" being "subjective judgment." (*Communities for a Better Environment*, at p. 93.)

b. *Erosion Control During Construction*

Horner's second criticism of the Project is that the documents he reviewed were "silent on construction-phase stormwater management" (underscoring deleted), and that "[w]ithout an effective erosion prevention plan, construction of the development is likely to increase the delivery of sediment and phosphate" to the wetland habitat and other bodies of water downstream.

SDR relies on this comment to argue that construction of the Project could have a significant impact on the environment due to runoff during construction. We reject SDR's argument because documents other than those reviewed by Horner address the mitigation of any environmental risk from erosion during construction.

First, the City's specific conditions for approval of the Project provides, "An erosion control system shall be designed and installed onsite during all construction activity. The system shall prevent discharge of sediment and all other pollutants onto adjacent streets and into the storm drain system. The City of Encinitas Best Management Practice Manual shall be employed to determine appropriate storm water pollution control practices during construction."

---

Similarly, *Preserve Wild Santee* dealt with proposed mitigation measures for harm to a sensitive butterfly species. That project improperly deferred the development of a plan to mitigate those impacts because "it [did] not specify performance standards or provide other guidelines," and thus it was not possible to determine whether mitigation measures would be sufficient. (*Preserve Wild Santee*, at p. 281.) Here, in contrast, the City is requiring, as a condition of approval of the Project, that Woodridge comply with specific and well-defined stormwater regulations. (*Oakland Heritage Alliance*, *supra*, 195 Cal.App.4th at p. 906 ["a condition requiring compliance with regulations is a common and reasonable mitigation measure"].)

27

Second, addressing potential environmental harm from erosion during the rainy season, the City approved the Project on the condition that "no grading permit shall be issued for work occurring between October 1st of any year and April 15th of the following year, unless the plans for such work include details of protective measures, including desilting basins or other temporary drainage or control measures, or both, as may be deemed necessary by the field inspector to protect the adjoining public and private property from damage by erosion, flooding, or the deposition of mud or debris which may originate from the site or result from such grading operations."[20]

Third, in approving the Project, the City required that Woodridge "obtain a grading permit prior to the commencement of any clearing or grading of the site." The City's municipal code requires that an application for a grading permit include erosion and sediment control plans, including descriptions of control measures. (Encinitas Mun. Code, § 23.24.150.)

Finally, as stated in the City's conditions for approval, because the Project is a grading project of more than an acre, it must meet additional requirements from the State Water Resources Control Board, which include preparing a Stormwater Pollution Prevention Plan for approval by the City. As Woodridge points out, a Storm Water

---

[20]     As the City has specifically incorporated the terms of its Best Management Practice Manual into its condition that the Project control erosion and stormwater management during construction, we reject SDR's contention that the City has improperly deferred the specification of mitigation measures to control harm to the environment during construction. The Best Management Practice Manual constitutes measurable standards for implementing and evaluating mitigation measures during construction.

Pollution Prevention Plan must address all pollutants and their sources, including sources of sediment associated with construction and construction site erosion.

Accordingly, based on the fact that Woodridge is required to (1) implement specific measures to control harm to the environment during construction based on the City's Best Management Practice Manual and follow additional measures during the rainy season; (2) submit a grading plan including detailed erosion control measures during construction; and (3) prepare a plan complying with State Water Resources Control Board's standards for controlling pollution during construction, we conclude that despite Horner's statement that he had not reviewed any documentation regarding an erosion control plan during construction, there is no basis in the record for a fair argument that the wetland habitat will be significantly impacted during construction of the Project.

4.    *Traffic*

In arguing that there is a fair argument that the Project will have a significant impact on traffic, SDR contends that an analysis submitted by a neighborhood resident shows that the delay at certain intersections in the area will increase to above a threshold level of significance which, pursuant to CEQA, the City has adopted to measure whether traffic impacts caused by a project will be significant, warranting the preparation of the traffic impact study as part of an EIR.[21]

_____

[21]    The CEQA Guidelines state:  "Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects.  A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by

29

The City has adopted thresholds of significance for traffic impacts based on guidelines developed by the San Diego Regional Traffic Engineers Council (SANTEC) and the local chapter of the Institute of Transportation Engineers (ITE). As relevant here, a significant impact occurs when the level of service (LOS) at an intersection is projected to be degraded to LOS "E" or LOS "F" as a result of a project. In addition, a significant impact occurs when an intersection already operating at LOS "E" or LOS "F" is projected to incur an increased delay of more than two seconds. Here, the City determined in connection with the initial study that the Project would not have a significant impact on traffic using the applicable criteria.

A neighborhood resident, Ron Katznelson, who is not a traffic engineer, but rather an electrical engineer, prepared and submitted a study on the traffic impacts of the Project. Katznelson's study focused on projected delays during peak morning hours at three intersections on Rancho Santa Fe Road that are controlled by three- or four-way stop signs. Katznelson concluded that two of the three intersections would incur an additional delay of over two seconds in the southbound lane during peak morning hours.[22] Katznelson also concluded that during peak morning hours the level of service at one of the intersections (Rancho Santa Fe Road and Lone Jack Road) would be

---

the agency and compliance with which means the effect normally will be determined to be less than significant." (Cal. Code Regs., tit. 14, § 15064.7, subd. (a).)

[22] Specifically, Katznelson concluded that the southbound lane at the intersection of Rancho Santa Fe Road and Lone Jack Road would incur an increased delay of 4.97 seconds, and the southbound lane at the intersection of Rancho Santa Fe Road and El Camino del Norte would incur an increased delay of 2.47 seconds.

30

degraded from LOS "E" to LOS "F," and that the overall delay at the intersection averaging the delay in all directions would exceed two seconds. Katznelson argued during his testimony before the City Council that these were significant impacts that required the preparation of a traffic study under the threshold of significance adopted by the City.

Katznelson's study was reviewed and critiqued by traffic engineers at Linscott, Law & Greenspan and by the City's traffic engineering division. Both reviewers explained that Katznelson's conclusions were flawed in several respects, two of which are significant here.

First, as Linscott, Law & Greenspan and the City's traffic engineering division explained, Katznelson applied an erroneous standard in estimating the number of peak morning commute trips as 18, overestimating by three trips. Specifically, Katznelson improperly relied in his analysis on SANDAG's 2006 San Diego Household Travel Study, Final Report, which, the City engineers explained, was not intended for use as vehicle trip generation data. As the City's traffic engineering division explained, "the incorrectly derived AM peak hour trip generation estimate is carried through the entire analysis" performed by Katznelson.

Second, Linscott, Law & Greenspan explained that "[a]t signalized and 'All-Way-STOP-Controlled (AWSC) unsignalized intersections, it is the standard of practice to use the overall intersection delay and LOS to represent the intersection operations in determining the significance of project impacts." Because the three intersections at issue here are all AWSC intersections, in determining the significance of the increased

31

intersection delay during the peak morning hours, Katznelson should not have focused on the delay to the southbound lane alone. Instead, the delay in each direction should have been averaged.[23] When the increased delays in each direction are averaged and the traffic volume data is based on the standard industry approach (not the approach used by Katznelson), the increased delay is less than two seconds at all three of the intersections on Rancho Santa Fe Road. Linscott, Law & Greenspan's comments contain a table showing the result of this analysis, demonstrating that the overall increased delay at each of the three intersections is less than two seconds and therefore not significant under the applicable threshold standards.[24]

---

[23]    Similarly, the City's traffic engineering division explained that "[b]ased on national and local standard industry practice, all-way stop control . . . intersections report service level and delay on an intersection basis," but Katznelson's study presented the "intersections . . . on an approach delay basis only."

[24]    For the first time in the trial court, SDR argued that it was improper for the City to rely on the conclusions in Linscott, Law & Greenspan's table showing the overall delay at each intersection because that table is inconsistent with the figures in the worksheets attached to Linscott, Law & Greenspan's analysis. SDR again raises that argument on appeal, contending that when certain mathematical calculations are performed, the worksheets show that the increased delay at the intersection of Rancho Santa Fe Road and Lone Jack Road is 2.1 seconds, not 1.7 seconds as shown in Linscott, Law & Greenspan's table. This issue was not raised with the City Council, and it may therefore not be raised for the first time in a petition for writ of mandate challenging the City Council's decision. CEQA review requires exhaustion of issues at the administrative level as a precondition to judicial review. (§ 21177.) "To advance the exhaustion doctrine's purpose '[t]he "exact issue" must have been presented to the administrative agency . . . .' " (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535.) Here, although Katznelson stated in his testimony before the City Council that "even under their criteria for average, there's one intersection that is past 2 percent," in context it is clear that Katznelson was referring to his *own* calculations of the intersection delay at Rancho Santa Fe Road and Lone Jack Road, which concluded the Project would result in an *average* intersection delay of 2.08 seconds. Katznelson never raised an issue based on

32

Here, because Katznelson's study was found to be flawed by experts in the field, it does not support a fair argument of significant impact to the environment due to the increased traffic on Rancho Santa Fe Road. Substantial evidence under CEQA may include "expert opinion supported by facts" (Cal. Code Regs., tit. 14, § 15384, subd. (b)) but does not include "unsubstantiated opinion or . . . evidence which is clearly erroneous or inaccurate" (*id*., subd. (a)). Here because Katznelson is not a traffic engineer and his analysis was deemed to be out of line with industry standards by traffic engineering experts, his study does not constitute substantial evidence. (See *Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 157 [agency could properly reject evidence concerning the impact of a proposed project when the "speakers were not qualified to render an expert opinion"]; *Cathay Mortuary, Inc. v. San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 281 [testimony of certain witnesses did not establish a disagreement among experts on environmental impacts when that testimony "exceeded the limits of their expertise as urban planners"]; *Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329, 1352 [critique of traffic consultant's study by a layperson did "not rise to the level of substantial evidence supporting a fair argument of a reasonable possibility that the project will have a significant effect on the environment"].)

SDR's arguments as to traffic impacts fail without the support of Katznelson's study to back them up. SDR argues that the Project will cause a significant impact to traffic because it will (1) create a delay of more than two seconds at an intersection on

_____

the worksheet data contained in Linscott, Law & Greenspan's analysis, and there was accordingly no opportunity for the record to be developed to respond to the argument and introduce expert testimony on the proper interpretation of the worksheets.

Rancho Santa Fe Road, and (2) it will reduce the level of service at one intersection to LOS "E" to LOS "F." However, as we have explained, Katznelson's study is the only evidence supporting those conclusions. Linscott, Law & Greenspan concluded that the delay at each intersection will be less than two seconds and that the level of service at each intersection will stay the same.[25]

5. *Neighborhood Streets and Safety*

Next, SDR takes issue with the initial study's conclusion that the Project would not have a significant impact in the sense that it would "substantially increase hazards due to a design feature (e.g., sharp curves or dangerous intersections)," SDR points out that the preexisting public roads leading to the Project site contain curves with 15 miles per hour advisory speeds and blind sharp turns. Based on this evidence, SDR argues that the Project would have a significant impact on the safety of the neighborhood unless the City requires it to have a secondary access route that avoided those hazards.

We reject SDR's argument because it does not identify a significant impact to the environment caused by the *Project itself.* Instead, SDR is describing preexisting hazardous roadway conditions in the surrounding neighborhood that will impact the

---

[25] The parties dispute whether a drop in level of service from LOS "E" to LOS "F" constitutes a significant impact under the threshold standards adopted by the City and under "Circulation Element Policy 1.3" of the City's general plan. Specifically, Woodridge contends that a significant impact occurs only when the level of service is currently at LOS "D" or better and then drops to LOS "E" or "F." SDR contends that a drop from LOS "E" to LOS "F" also constitutes a significant impact. We need not resolve this dispute, as the only qualified expert analysis of the issue in the record shows that the level of service at the intersection will *not* drop as a result of the Project. Katznelson's study was the only analysis showing a drop between levels of service.

34

safety of the access route *to the Project*. The new road to be built on the Project site itself is a short, straight, private roadway with a wide cul-de-sac turn around at the end and does not contain hazardous road conditions. "[T]he purpose of an EIR is to identify the significant effects of a project on the environment, not the significant effects of the environment on the project." (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473.) Thus, " '[t]o require an EIR . . . where the proposed project is challenged on the basis of preexisting environmental conditions rather than an adverse change in the environment, would impose a requirement beyond those stated in CEQA or its guidelines, and is thus prohibited.' " (*South Orange County Wastewater Authority*, *supra*, 196 Cal.App.4th at p. 1615.)

      6.     *Parking*

SDR's final argument is that the Project will cause a significant impact to the environment in that more vehicles will be parked on neighborhood streets, and further, that streets congested with parked cars could "affect emergency response vehicles entering and exi[]ting the Project and the surrounding area."

Case law holds that "CEQA considers a project's impact on parking of vehicles to be a physical impact that could constitute a significant effect on the environment." (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1051.) However, in this case, as we will explain, SDR has not pointed to any evidence in the record suggesting that the Project will significantly impact the parking of vehicles on public streets.

35

SDR identifies photographs in the record showing that, at times, numerous vehicles are parked on the street several blocks away from the Project site. Although this evidence does not establish that the same conditions exist *closer* to the Project site, where residents of the Project or their visitors might park, even if such conditions also existed near the Project, there is no basis for concluding that the Project would significantly add to any existing congestion. The Project provides at least two garage parking spaces for each residence and a driveway surface for parking. In addition, the private road that will be constructed as part of the Project provides for an eight-foot-wide paved parking easement on the west side of the road. In light of the fact that parking for several cars will be available at each residence plus additional parking will be available on the private road, SDR has identified no basis in the record to conclude that congested parking on surrounding public streets will be a problem created by the Project.[26]

To the extent that SDR is arguing that any additional street parking caused by the Project will impede ingress and egress for emergency vehicles, that possibility was expressly considered and rejected by fire department authorities. The fire marshal testified at the City Council hearing that the private road planned for the Project was 32 feet in overall width, which afforded an adequate 24-foot-wide roadway to be used as a

---

[26] SDR relies on a letter from a traffic engineer, Bill Darnell, which states that "lack of adequate parking will result in problems for the subdivision as well as the surrounding residents." However, what SDR fails to point out is that Darnell recommended that the Project should plan for two spaces for resident parking and an additional space for guest parking. As we have explained, each residence will have two garage and two driveway spaces, and there will be additional parking along the west side of the private road, exceeding Darnell's recommendation.

36

fire lane, even with the eight-foot-wide strip of parking on one side of the roadway, and the cul-de-sac was designed with sufficient room at the end for the fire engines to turn around. SDR cites no evidence to the contrary to show that emergency vehicles would not be able to access the area due to any increased parking on the streets.

## DISPOSITION

The judgment of the trial court is reversed, and the trial court is directed to enter a new order denying the petition for writ of mandate.

IRION, J.

WE CONCUR:


McINTYRE, Acting P. J.


O'ROURKE, J.